UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

NINA JAFARI a/k/a Fatemeh Jafari,

Defendant.

**DECISION AND ORDER**

13-CR-19 EAW

## I.   **INTRODUCTION**

Defendant Nina Jafari ("Defendant"), charged in a five count indictment with health care fraud in violation of 18 U.S.C. § 1347 (Dkt. 1), was convicted after a jury trial on September 29, 2014, of counts 1, 2, 3 and 5, and acquitted of the charges in count 4 (Dkt. 82).  On November 24, 2014, the Government moved for a preliminary order of forfeiture pursuant to Fed. R. Crim. P. 32.2(b)(1) and 18 U.S.C. § 982(a)(7).  (Dkt. 97).  Specifically, the Government seeks a personal money judgment of one hundred twenty-five thousand dollars ($125,000.00).  (*Id.* at 21).

Defendant filed papers in opposition (Dkt. 100), and argument was held before the Court on December 5, 2014 (Dkt. 104).

After considering the various submissions and arguments submitted on behalf of the parties, and for the reasons set forth below, the Court grants the Government's motion for a preliminary order of forfeiture and orders that Defendant's right, title and interest in the amount of one hundred twenty-five thousand dollars ($125,000.00) shall be forfeited

- 1 -

to the United States as gross proceeds Defendant obtained, directly or indirectly, from the scheme to defraud a health care program.

## II.    FACTUAL BACKGROUND

Defendant, practicing as a licensed clinical social worker, was charged on January 18, 2013, with five counts of health care fraud in violation of 18 U.S.C. § 1347.[1]  The indictment alleged an overall scheme by Defendant to defraud BlueCross BlueShield of Western New York ("BCBS") during the time period January 2006 through May 2009. (Dkt. 1 at ¶ 16).  Each count in the indictment related to charges submitted by Defendant to BCBS with respect to a different family whom Defendant claimed to have treated.[2]

In essence, the indictment alleged that Defendant billed BCBS using a Current Procedural Terminology ("CPT") code that resulted in inflated payments and payments for services that were never rendered.  The code typically charged by Defendant was CPT code 90808, defined to be appropriate for individual psychotherapy of approximately 75

---

[1]    18 U.S.C. § 1347 provides, in relevant part, as follows:
   (a)    Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice –
      (1)    to defraud any health care benefit program; or
      (2)    to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,
in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both.

[2]    The patients are identified by their insurance numbers in the indictment. However, the trial exhibits and testimony, as well as the papers submitted in connection with the Government's motion for a preliminary order of forfeiture, identify the patients by their names.  No motion to seal or otherwise keep confidential the identities of the patients has been filed.  As a result, the Court will also reference the patients by their names for purposes of this Decision and Order.

to 80 minutes face-to-face with the patient.   According to the indictment, Defendant executed the fraudulent scheme in three different ways: (1) Defendant billed BCBS for individual psychotherapy sessions using CPT code 90808 when, in fact, Defendant met with the patient for less than 75 to 80 minutes; (2) Defendant met with multiple family members for group therapy sessions, but instead of billing CPT code 90847 for family psychotherapy, she charged each family member separately under CPT code 90808; and, (3) Defendant billed BCBS for individual psychotherapy sessions using CPT code 90808, when no therapy sessions occurred.  (*Id.* at ¶¶ 17-19).

The case was tried before a jury commencing on September 22, 2014.  (Dkt. 74). Among other witnesses, the Government presented testimony from five members of the families who were the subject of the counts in the indictment, representatives of BCBS, and FBI Agent Thomas W. Provost ("Agent Provost").   Voluminous documents were introduced into evidence reflecting charges submitted by Defendant to BCBS, including documents that contained forged signatures of Defendant's patients.  (Tr.[3] 182, 270).

Agent Provost explained that BCBS reported Defendant to the FBI for purposes of an investigation after BCBS investigators were stymied in their efforts to review Defendant's records and conduct an audit.  (Tr. 332; *see* Tr. 224-41, 243-46 (testimony concerning efforts by BCBS to review Defendant's records and conduct an audit)). Defendant had been identified by BCBS as an "outlier" because she stood out from the rest of her field in her billings using CPT code 90808.  (Tr. 210-11).  BCBS had looked at

---

[3]      References to "Tr." are to the corresponding page number(s) of the official transcript of the trial filed at Docket numbers 89 through 96.

the data for December 1, 2007 through November 2008, and approximately 97.5% of Defendant's bills were charged under CPT code 90808. (Tr. 211). Additionally, BCBS reviewed Defendant's billings for her patients during the time frame of January 1, 2006 through April 30, 2009, and of approximately 400 patients, there were only 10 patients for whom Defendant did not bill under CPT code 90808. (Tr. 216).

As part of the investigation, a former patient of Defendant's, Jeanette Steger, agreed to audio record conversations with Defendant. The audio recordings, which were admitted into evidence, reflected efforts by Defendant to influence Ms. Steger's response to BCBS inquiries, including Defendant telling Ms. Steger that she should deny the existence of documents concerning her family's visits with Defendant and falsify documentation that BCBS asked Ms. Steger to complete.

The jury returned a verdict of guilty with respect to four of the five counts in the indictment. The jury acquitted Defendant of the conduct charged in count 4. Count 4 alleged that Defendant committed health care fraud from October 2006 through December 2008, by submitting fraudulent claim forms for approximately 117 individual psychotherapy sessions billed under CPT code 90808 related to the Ferrucci family. The jury convicted Defendant of the remaining counts that charged as follows:

Count 1:    from January 2009 through May 2009, Defendant submitted fraudulent claim forms for approximately 39 individual psychotherapy sessions billed under CPT code 90808 related to the Steger family;

- 4 -

Count 2:    from July 2008 through February 2009, Defendant submitted fraudulent claim forms for approximately 56 individual psychotherapy sessions billed under CPT code 90808 related to the Sidoti family;

Count 3:    from December 2005 through August 2008, Defendant submitted fraudulent claim forms for approximately 114 individual psychotherapy sessions billed under CPT code 90808 related to the Willis family; and,

Count 5:    from September 2007 through July 2008, Defendant submitted fraudulent claim forms for approximately 42 individual psychotherapy sessions billed under CPT code 90808 related to the Kern family.

The indictment also included forfeiture allegations seeking to forfeit "[t]he sum of ONE HUNDRED TWENTY-FIVE THOUSAND DOLLARS ($125,000.00) United States currency or any other proceeds generated from the offense of each count of conviction," as well as substitute property. (Dkt. 1 at 15).

The parties agreed prior to the commencement of the trial that any issues with respect to forfeiture should be resolved by the Court. After the jury verdict, the Government and Defendant attempted to reach a resolution of the forfeiture issues, but they were unable to do so, and the Government filed its motion for a preliminary order of forfeiture. (Dkt. 97). The Court adjourned the scheduled sentencing date of December 5, 2014, so that it could first resolve the forfeiture issues. (Dkt. 101). On December 5,

2014, the parties appeared before the Court, and agreed that a hearing was not necessary with respect to the forfeiture issues.  (Dkt. 104).  The Court held oral argument and reserved decision.  (*Id.*).

## III.   **DISCUSSION**

"Criminal forfeiture under section 982 is a form of punishment, separate and apart from any restitutive measures imposed during sentencing."  *United States v. Peters*, 732 F.3d 93, 98 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 2740 (2014).  It is considered an "additional sanction" that "serves no remedial purpose" but rather is designed simply as a form of punishment.  *Id.* (internal quotations omitted).  "The amount of forfeiture 'must bear some relationship to the gravity of the offense that it is designed to punish.'"  *Id.* (quoting *United States v. Bajakajian*, 524 U.S. 321, 334 (1998)).

18 U.S.C. § 982(a)(7) sets forth the standard applicable to forfeiture in the context of a health care fraud conviction:

> The court, in imposing sentence on a person convicted of a Federal health care offense, shall order the person to forfeit property, real or personal, that constitutes or is derived, directly or indirectly, from the gross proceeds traceable to the commission of the offense.

18 U.S.C. § 982(a)(7).

Pursuant to the express language of the statute, forfeiture is mandatory when sentencing a person convicted of health care fraud.  In other words, the Court has no discretion – a procedurally proper request for forfeiture must be granted when sentencing a person convicted of health care fraud.  *United States v. Poulin*, 690 F. Supp. 2d 415, 420 (E.D. Va. 2010) ("The plain language of the statute [§ 982(a)(7)] provides that such

forfeiture is mandatory."), *aff'd*, 461 F. App'x 272 (4th Cir. 2012); *United States v. Patel*, No. 06-60006, 2009 WL 1579526, at *20 (W.D. La. June 3, 2009) ("The mandatory language of this statute [§982(a)(7)] leaves the Court absolutely no discretion in imposing this portion of the sentence.").

The government bears the burden to prove "the propriety of forfeiture by a preponderance of the evidence." *United States v. Nicolo*, 597 F. Supp. 2d 342, 345 (W.D.N.Y. 2009); *see also United States v. Gaskin*, 364 F.3d 438, 461 (2d Cir. 2004) (criminal forfeiture is part of the sentencing process and, therefore, as with other aspects of sentencing, "the government need prove facts supporting forfeiture only by a preponderance of the evidence."). The government may meet this burden "based on evidence already in the record . . . and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable." Fed. R. Crim. P. 32.2(b)(1)(B); *see also United States v. Capoccia*, 503 F.3d 103, 109-10 (2d Cir. 2007) (forfeiture determination can be based both on evidence presented at forfeiture hearing and evidence already in the trial record).

Furthermore, the traditional rules of evidence do not apply, and courts may consider hearsay and other inadmissible evidence so long as it is sufficiently reliable. *See* Fed. R. Evid. 1101(d)(3) (providing that that Rules of Evidence are inapplicable in sentencing proceedings); *Nicolo*, 597 F. Supp. 2d at 345 ("Deciding a motion for a preliminary order of forfeiture is part of the sentencing process. As such, the rules of evidence that must be followed in criminal trials do not apply to this proceeding.").

A.    A Personal Money Judgment Under 18 U.S.C. § 982(a)(7)

The procedures for forfeiture applicable in the health care fraud setting are found

at Fed. R. Crim. P. 32.2 and 21 U.S.C. § 853.  *See* 18 U.S.C. § 982(b)(1) ("The forfeiture

of property under this section . . . shall be governed by the provisions of . . . (21 U.S.C.

853).").[4]  The statutory language requires that the provisions with respect to forfeiture be

"liberally construed to effectuate its remedial purposes."  21 U.S.C. § 853(o).  Moreover,

where the Government is only seeking a personal money judgment (as opposed to

specific property), Rule 32.2 simply requires the Court to determine the amount of the

money that the defendant should be ordered to pay.  *See* Fed. R. Crim. P. 32.2(b)(1)(A).

There is a paucity of case law addressing forfeiture in the context of health care

fraud under § 982(a)(7), but those courts that have addressed the issue have held that

forfeiture is authorized in the form of a personal money judgment.  *Poulin*,[5] 690 F. Supp.

---

[4]      The exception to the incorporation of 21 U.S.C. § 853 is subsection (d) of that section, which creates a rebuttable presumption in favor of the government under certain circumstances.  *See* 18 U.S.C. § 982(b)(1).  In other words, no rebuttable presumption exists with respect to health care forfeiture.

[5]      The district court in *Poulin*, 690 F. Supp. 2d 415 (E.D. Va. 2010), determined that it could not issue a "nonspecific money judgment that would allow the Government to seize any of Defendant's monetary assets." *Id.* at 427.  Instead, according to the court, "a forfeiture money judgment under § 982(a)(7) must be restricted to money, identified by the Government, that is 'traceable' to the underlying health care offense." *Id.*  Defendant has not objected to the Government's request in this case for a so-called "nonspecific" money judgment, and the Court finds the *Poulin* court's reasoning on this issue both impractical and inconsistent with the law in this Circuit.  In other words, if a personal money judgment is authorized, then like any other money judgment it should be collectable against a defendant regardless of whether any assets in his or her possession can be linked to the underlying crime.  *See United States v. Awad*, 598 F.3d 76, 78 (2d Cir. 2010) (criminal forfeiture need not be traced to identifiable assets in a defendant's possession, and to hold otherwise would incentivize defendant "to rid himself of his ill-

2d at 425 ("despite the statute's use of the word 'property,' its reference to 'gross proceeds' contemplates forfeiture not only of any specific property derived from such proceeds, but also of a money judgment for the full amount of those proceeds traceable to the health care offense.").

In other words, if the Government proves the amount of the gross proceeds of the fraud, it "is entitled to a money judgment in that amount." *United States v. Louthian*, No. 1:12CR00002, 2013 WL 594232, at *3 (W.D. Va. Feb. 15, 2013) (awarding forfeiture order for health care fraud in the amount of $907,521 personal money judgment). *See also United States v. Boesen*, 473 F. Supp. 2d 932, 955 (S.D. Iowa 2007) (awarding forfeiture order for health care fraud in the amount of $425,869.06 personal money judgment); *United States v. Adegboye*, No. CR-11-30-D, 2011 WL 5025531, at *3 (W.D. Okla. Oct. 21, 2011) (awarding forfeiture order for health care fraud in the amount of $299,694 personal money judgment); *United States v. Palazzo*, No. 05-0266, 2008 WL 5381581, at *10 (E.D. La. Dec. 18, 2008) (awarding forfeiture order for health care fraud in the amount of $655,260.97 personal money judgment).

Although the Second Circuit Court of Appeals has not specifically addressed the appropriateness of a personal money judgment in the context of 18 U.S.C. § 982(a)(7), its rulings with respect to the appropriateness of a money judgment in other forfeiture

---

gotten gains to avoid the forfeiture sanction." (internal alterations and quotations omitted)).  Indeed, the other cases cited in this Decision and Order that have recognized the appropriateness of a money judgment pursuant to § 982(a)(7) have not included the limits on a money judgment imposed in *Poulin*, and although the district court's decision in *Poulin* was affirmed by the Fourth Circuit Court of Appeals, this particular issue was not addressed on appeal. *See* 461 F. App'x at 287-88.

settings support the conclusion that a money judgment may be awarded under § 982(a)(7). *See United States v. Kalish*, 626 F.3d 165, 168-69 (2d Cir. 2010) (money judgment is appropriate in fraud forfeiture cases brought by way of 28 U.S.C. § 2461); *United States v. Awad*, 598 F.3d 76, 78-79 (2d Cir. 2010) (money judgment is appropriate under primary drug forfeiture statute, 21 U.S.C. § 853).

As a result, the Court finds that the Government is entitled to a personal money judgment against Defendant pursuant to 18 U.S.C. § 982(a)(7). Indeed, Defendant does not appear to challenge the Government's underlying right to a personal money judgment in this case. Rather, as discussed below, Defendant's main opposition focuses on the amount of any money judgment that should be awarded.[6]

B.      The Amount of the Personal Money Judgment

The case law regarding the appropriate amount of a money judgment in a forfeiture case involving health care fraud is sparse, and the Court is not aware of any case within this Circuit that has addressed the issue. However, there are several relevant principles that emerge from a review of the case law from other Circuits that have

---

[6]      Defendant also argues that the Court should consider her lack of financial resources and inability to satisfy any money judgment. The Court finds this argument unpersuasive. The law is clear that a district court need not consider a defendant's argument in opposition to forfeiture that she lacks the financial resources to satisfy the forfeiture judgment. *United States v. Roble*, 396 F. App'x 762, 764 (2d Cir. 2010). This is consistent with the principle that "'[m]andatory forfeiture is concerned not with how much an individual has but with how much he received in connection with the commission of the crime.'" *Awad*, 598 F.3d at 78 (citation omitted). *See also United States v. Newman*, 659 F.3d 1235, 1243 (9th Cir. 2011) ("Congress sought to punish equally the thief who carefully saves his stolen loot and the thief who spends the loot on 'wine, women, and song.'") (citation omitted).

addressed forfeiture in the context of 18 U.S.C. § 982(a)(7), and those cases in this Circuit that have addressed forfeiture more broadly.

Specifically, it is apparent that Defendant is not entitled to any credit or set-off for the value of health care services that she did provide as part of the fraudulent scheme. In addition, both uncharged executions of the fraudulent scheme and acquitted conduct may be considered by the Court, so long as the Government meets its underlying preponderance of the evidence burden. Finally, particularly in the context of this case where the evidence demonstrates that Defendant undertook efforts to hide her fraud, calculating the appropriate amount of a money judgment through extrapolation based upon known data, is a reasonable means by which to arrive at the money judgment figure.

  1.  <u>No Right of Set-Off</u>

Forfeiture under 18 U.S.C. § 982(a)(7) for health care fraud requires forfeiture of the entire amount a defendant received through fraudulent billing. The statute plainly requires forfeiture of "gross proceeds," not profits, and thus refers to "'the total amount brought in' through the criminal enterprise." *United States v. Poulin*, 461 F. App'x 272, 288 (4th Cir. 2012) (quoting *United States v. McHan*, 101 F.3d 1027, 1041 (4th Cir. 1996)). In other words, Defendant has no right to apply a set-off for the amount she would have received had she billed properly for services actually rendered. *See Boesen*, 473 F. Supp. 2d at 954 ("To allow the perpetrator of a fraud to mitigate his eventual forfeiture exposure by such a set-off procedure would seem fundamentally inconsistent with the purpose of the statute and challenging, if not impossible, in its application from case to case."); *Louthian*, 2013 WL 594232, at *4 (defendant convicted of health care

fraud not entitled to deduct charges for services that were medically necessary); *Palazzo*, 2008 WL 5381581, at *10 ("There is no authority for [defendant's] . . . argument that she is entitled to a set-off for [health care] services that were actually performed.").

In this case, the evidence produced at trial reflected that on many occasions Defendant provided no services to support the charges that she submitted to BCBS, but on other occasions she did provide services, albeit not in the inflated amount that she submitted to BCBS.  In calculating a forfeiture amount, the Court need not give Defendant credit for the value of services that she did provide through her fraudulent scheme.

Nonetheless, in the Government's submissions, Agent Provost attempts to calculate an appropriate amount of forfeiture by crediting Defendant with a set-off for the value of services that were provided.  The appropriateness of this calculation is discussed further below.

2. <u>Uncharged Executions of the Scheme May be Considered</u>

Although each count of the indictment in this case related to specific executions of the alleged scheme, the indictment charged more broadly a fraudulent scheme to defraud BCBS during the time period January 2006 through May 2009 in violation of 18 U.S.C. § 1347.  The Government could have charged each execution of the scheme as a separate count, but it certainly was not required to do so.  *United States v. Hickman*, 331 F.3d 439, 446 (5th Cir. 2003) ("any scheme can be executed a number of times, and each execution may be charged as a separate count"); *see also United States v. Mermelstein*, 487 F. Supp. 2d 242, 249-51 (E.D.N.Y. 2007) (indictment sufficiently alleged violation of 18

- 12 -

U.S.C. § 1347 which criminalizes a scheme to defraud regardless of the details concerning specific executions of the scheme); *United States v. Soliman*, No. 06-CR-236A, 2008 WL 2690281, at *4 (W.D.N.Y. July 1, 2008) (each execution of scheme to commit health care fraud, like bank fraud, can be charged as a separate offense).

Since Defendant was charged with engaging in a fraudulent scheme to defraud BCBS, and since she was convicted of some of the counts of the indictment, she may be required to forfeit the "gross proceeds" traceable to the underlying fraudulent scheme, even where those gross proceeds extend beyond the amounts at issue in the specific counts in the indictment. As the court explained in *Boesen*, 473 F. Supp. 2d 932, where defendants convicted of health care fraud were required to forfeit the proceeds of the entire scheme to defraud, including uncharged executions of that scheme:

> The law does not require the Government to charge a defendant with every execution of a health care fraud scheme, and the Government could indict a defendant for a health care fraud scheme by charging only one execution of that scheme.
>
> Each execution does constitute a separate offense, and the Government could in fact have charged Defendant with the hundreds of other executions of the health care fraud scheme. . . . The statute criminalizes executions of the scheme; the overall scheme is thus inherently part of the offenses of which Defendant has been convicted. . . . Forfeiture of the gross proceeds of uncharged executions of the scheme that Defendant was convicted of serves this purpose.

*Id.* at 952-53; *see also Adegboye*, 2011 WL 5025531, at *3 (court entered a personal money judgment against the defendants convicted of health care fraud in the amount of $299,694, representing the amount of the gross proceeds of the health care fraud scheme

received from Medicare, even though specific losses for the counts on which defendants were convicted only amounted to $16,094.80).

Considering uncharged conduct that is part of a fraudulent scheme is consistent with the law as articulated by courts in the Second Circuit.  *See United States v. Stathakis*, 320 F. App'x 74, 79 (2d Cir. 2009); *United States v. Daugerdas*, No. S3 09 Cr. 581 (WHP), 2012 WL 5835203, at *2 (S.D.N.Y. Nov. 7, 2012); *United States v. Hatfield*, No. 06-CR-0550 (JS), 2010 WL 4177159, at *6 (E.D.N.Y. Oct. 18, 2010); *United States v. Kahale*, No. 09-CR-159 (KAM), 2010 WL 3851987, at *30 (E.D.N.Y. Sept. 27, 2010). *Cf. Capoccia*, 503 F.3d at 110 ("in the circumstances of this case, where the government has alleged discrete violations of a statute [18 U.S.C. § 2314 – interstate transportation of stolen property] that does not criminalize a scheme, conspiracy, or enterprise, the government is not entitled to forfeiture of proceeds from uncharged violations regardless of whether they and the charged violations are part of a common scheme.").

As a result, even though the fees paid to Defendant for the alleged counseling services at issue in the specific counts of the indictment amount to less than $40,000 (Dkt. 98 at ¶¶ 7-11), the Government may recover a forfeiture judgment equal to the gross proceeds traceable to the underlying fraudulent scheme.  It is not limited to only recovering the amount at issue in the specific counts of the indictment.

### 3.    Acquitted Conduct May be Considered

In addition to uncharged executions of the scheme, the Court may also consider the conduct that was the subject of count 4, even though Defendant was acquitted on that count, if the Court finds that the Government has met its preponderance of the evidence

- 14 -

burden.  In other words, even though a jury determined that the Government had not proved beyond a reasonable doubt the charges related to the Ferrucci family that were the subject of count 4, this Court may still consider the evidence related to the Ferrucci family in awarding a forfeiture judgment if it determines that the Government has met its burden with respect to the evidence under the preponderance of the evidence standard.

        a.      The Majority View Supports Considering Acquitted Conduct

The majority of Circuit Courts that have considered the issue have held that a sentencing court may consider acquitted conduct when determining the amount of proceeds to be forfeited by a defendant, so long as the court finds that it is forfeitable by a preponderance of the evidence.  *See United States v. Venturella*, 585 F.3d 1013, 1017-18 (7th Cir. 2009) (collecting cases); *United States v. Jennings*, 487 F.3d 564, 583 (8th Cir. 2007) (affirming forfeiture of proceeds of defendant's entire mail fraud scheme based on a conviction of just two substantive counts); *United States v. Genova*, 333 F.3d 750, 762 (7th Cir. 2003) ("The fact that Genova was acquitted of counts charging that he devoted the City's resources to his home-improvement projects does not eliminate all possibility of a forfeiture based on these activities.  Even counts on which the jury acquits may be considered in sentencing, if the judge finds by a preponderance of the evidence that the criminal activities occurred."); *United States v. Plaskett*, 355 F. App'x 639, 644-45 (3d Cir. 2009) (district court's consideration of acquitted conduct in calculation of forfeiture was proper).

The Ninth and Tenth circuits appear to have reached a different conclusion. *See United States v. Bader*, 678 F.3d 858, 894 (10th Cir. 2012) ("There must be a nexus between the property forfeited and *an offense of conviction* that authorizes forfeiture."); *United States v. Garcia-Guizar*, 160 F.3d 511, 518 (9th Cir. 1998) (criminal forfeiture statute 21 U.S.C. § 853(a)(1) requires that forfeited money constitute proceeds obtained in connection with the drug activities for which a defendant is convicted, and "[t]hus, only that part of the $43,070 found in Garcia's storage locker that the government has proven by a preponderance of the evidence was proceeds of the conduct for which Garcia was actually convicted is properly subject to criminal forfeiture under § 853(a)(1).").

In *United States v. Fruchter*, 411 F.3d 377 (2d Cir. 2005), the Second Circuit Court of Appeals considered this issue in the context of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq*. The defendant argued that a district court "cannot use acquitted conduct as the basis for punishment." *Id.* at 383-84. The Court, citing *Genova*, found that "[a]lthough we have not previously considered whether proceeds derived from conduct forming the basis of a charge of which the defendant was acquitted can be counted as 'proceeds' of racketeering activity, it seems plain that they can." *Id.* at 384. *Cf. Capoccia*, 503 F.3d at 117-18 (characterizing the holding in *Fruchter* not as authorizing forfeiture of proceeds traceable to "acquitted" or "uncharged" conduct, but rather as relying on "the breadth of the conduct forming the basis of the offense of conviction," and noting that "[w]here the conviction itself is for executing a scheme, engaging in a conspiracy, or conducting a racketeering enterprise, the government need only establish that the forfeited assets have

the 'requisite nexus' . . . to that scheme, conspiracy, or enterprise.") (internal citation omitted). *See also United States v. Singh*, 390 F.3d 168, 191 (2d Cir. 2004) ("The acquittals merely represented jury determinations that specific executions of the scheme to defraud had not been proved beyond a reasonable doubt. . . . It is well-settled that acquitted conduct can be taken into account in sentencing and that a preponderance of the evidence is all that is required to prove the amount of loss.").

Although the Second Circuit Court of Appeals has not squarely addressed the issue, district courts in New York have found that a sentencing court may consider counts on which a defendant was acquitted when calculating the amount of proceeds to be forfeited by a defendant. *See United States v. Peters*, 257 F.R.D. 377, 387 (W.D.N.Y. 2009) (citing *Capoccia*, and finding conspiracy to commit bank fraud enables consideration of acquitted conduct during forfeiture phase); *Hatfield*, 2010 WL 4177159, at *6 ("[T]he Government can also seek forfeiture of proceeds derived from 'uncharged executions' of Defendants' fraudulent schemes . . . And this even includes the proceeds of 'acquitted conduct,' if the Government can now prove these violations by a preponderance of the evidence.") (internal citations omitted); *but see United States v. Maye*, No. 08-CR-194S, 2014 WL 1671506, at *3-4 (W.D.N.Y. Apr. 23, 2014) (declining to consider acquitted conduct when calculating forfeiture because the government alleged discrete violations of a statute that did not criminalize a scheme, conspiracy, or enterprise, and the defendant was acquitted on the conspiracy charge); *Kahale*, 2010 WL 3851987, at *30 (while the general rule is that a defendant cannot be ordered to forfeit funds which are proceeds of uncharged or acquitted conduct, "where an indictment

charges a conspiracy or scheme to defraud, the proceeds of uncharged or acquitted conduct may become forfeitable because the government may be able to prove that money 'involved in the uncharged or acquitted [conduct] nevertheless constituted the proceeds of, or was traceable to, or was involved in, the [conspiracy or scheme to defraud] crime of conviction.'") (alterations in original) (citation omitted).

In the context of 18 U.S.C. § 982(a)(7), the court's decision in *Adegboye*, 2011 WL 5025531, is on point. In that case, the court entered a personal money judgment against the defendants convicted of health care fraud in the amount of $299,694, representing the amount of the gross proceeds of the health care fraud scheme received from Medicare, even though specific losses for the counts on which the defendants were convicted only amounted to $16,094.80 and even though the defendants were acquitted of the conspiracy count in the indictment. *Id.* at *3.

Here Defendant was charged with an overall scheme to defraud BCBS. Even though Defendant was acquitted of the specific execution of the scheme charged in count 4, the Court concludes that it may consider the conduct at issue in count 4 if it finds that the Government has proven by a preponderance of the evidence fraud related to the Ferrucci family that was part of the overall scheme.

b.  The Evidence Pertaining to Count 4

Count 4 of the indictment charged Defendant with health care fraud related to the Ferrucci family – specifically Mario Ferrucci, his wife Kimberly, and his daughter Ariana. The indictment alleged that Defendant fraudulently submitted claim forms for 117 outpatient individual psychotherapy sessions billed under the CPT code 90808, when

such services were not rendered.  By reason of the finding of not guilty on this count, the jury determined that the Government had failed to prove this conduct beyond a reasonable doubt.

However, notwithstanding the jury's verdict of not guilty on count 4, the Court concludes that the evidence presented at trial fully supports a finding under a preponderance of the evidence standard that Defendant engaged in health care fraud with respect to charges submitted to BCBS for services allegedly rendered to the Ferrucci family.  Indeed, based upon the totality of the evidence presented at trial, it is apparent that Defendant's conduct with respect to the Ferrucci family was simply part of her underlying scheme to defraud BCBS by submitting inflated charges for counseling services under CPT code 90808.

Mario Ferrucci testified that he began seeing Defendant for individual counseling in 2006 or 2007 (Tr. 279-80), and that he typically met with Defendant for 45 minute sessions (Tr. 280).  Mr. Ferrucci testified that he never saw Defendant for 75 to 80 minute sessions.  (Tr. 280-81).  Mr. Ferrucci testified that there came a time that he began seeing Defendant with his wife Kimberly, and that the typical practice involved him first meeting with Defendant "between 30 minutes and 45" and then his wife would meet with Defendant for a similar period of time individually, and then they would meet with Defendant together at the end of the session, with the total session lasting "usually no more than an hour."  (Tr. 282-83).  Although it is possible to conclude based upon this testimony that there were occasions where the length of Defendant's entire session with Mr. and Mrs. Ferrucci lasted longer than one hour, Mr. Ferrucci was very clear during his

testimony that he did not meet with Defendant alone for 75 to 80 minutes, followed by his wife meeting with Defendant alone for 75 to 80 minutes. (Tr. 284-85).

Government Exhibit 10 reflects a total of almost $3,000 charged by Defendant to BCBS under CPT code 90808 for 35 separate individual sessions allegedly held with Mr. Ferrucci. Moreover, on at least 13 of those occasions, Defendant also submitted a charge to BCBS under CPT code 90808 for an individual session allegedly held with Mrs. Ferrucci on the same date. (*See* Government Exhibit 10). In other words, Defendant submitted charges to BCBS claiming that she had met with Mr. Ferrucci and Mrs. Ferrucci separately for 75 to 80 minute individual sessions on 13 separate occasions (i.e., for a total of over two hours on those dates).

Defendant attempts to discredit this evidence by arguing that the appropriate CPT code to be charged for a session lasting one hour is unclear, since CPT code 90808 pertains to sessions lasting "approximately 75 to 80 minutes" and the next code (CPT code 90806) pertains to sessions lasting "approximately 45 to 50 minutes". (*See, e.g.,* Government Exhibit 63A). In other words, there is no CPT code identified for a session lasting between 50 minutes and 75 minutes.

While Defendant's point is well taken, and certainly could impact the Court's conclusions as to whether Defendant engaged in fraud if she met with a patient individually for one hour and submitted charges using CPT code 90808 (i.e., 75 to 80 minutes) versus CPT code 90806 (i.e., 45 to 50 minutes), the evidence with respect to Mr. Ferrucci demonstrates that Defendant did far more than simply submit charges under CPT code 90808 for an individual session with Mr. Ferrucci. Rather, as discussed above,

the evidence demonstrates that on at least 13 separate occasions, Defendant submitted charges to BCBS claiming to have met individually with Mr. Ferrucci for 75 to 80 minutes and Mrs. Ferrucci for 75 to 80 minutes.

When this evidence is considered along with the other evidence relevant to Defendant's scheme to defraud, including Mr. Ferrucci's testimony that his daughter saw Defendant approximately five times (Tr. 286) and yet Government Exhibit 10 reflects approximately twenty charges submitted by Defendant to BCBS pertaining to Mr. Ferrucci's daughter (Tr. 287; *see* Government Exhibit 10), the Court concludes that the totality of the evidence plainly demonstrates by a preponderance of the evidence that Defendant engaged in health care fraud with respect to charges she submitted to BCBS pertaining to the Ferrucci family. Indeed, from the Court's perspective, one of the most damaging pieces of evidence against Defendant were the tape recordings made by Jeanette Steger of the Defendant. Those recordings support the conclusion that any errors in billings submitted by Defendant to BCBS were not inadvertent, but rather were a part of an orchestrated scheme by Defendant to defraud BCBS. The evidence supports the conclusion that the charges related to the Ferrucci family were part of that scheme.

4.     Calculating the Forfeiture Money Judgment

Having determined that Defendant is not entitled to any credit for the value of services actually rendered as part of the fraudulent scheme, and that the Court may consider both uncharged and acquitted conduct, the Court is now tasked with determining an appropriate amount for the forfeiture judgment. The Government has requested a personal money judgment in the amount of $125,000, reasoning that the extent of

Defendant's fraud was extensively more significant, but that the Government would voluntarily limit itself to the amount initially set forth in the indictment.

Although Defendant raises objections to the Court's consideration of uncharged and acquitted conduct, she does not credibly dispute the appropriateness of a money judgment in the amount of $125,000, in the event both uncharged and acquitted conduct is considered. Indeed, Defendant represents in her filing related to the loss calculation in the presentence investigation report ("PSR"), that an appropriate loss amount for sentencing purposes is in the range of $120,000 to $200,000 (as opposed to the loss calculation contained in the PSR of over $200,000). (Dkt. 99 at ¶ 10). In other words, Defendant appears to have conceded that, if acquitted and uncharged conduct is included in the calculation, a forfeiture money judgment in the amount of $125,000 is within the range of reasonableness.

Of course, "[t]he calculation of forfeiture amounts is not an exact science. The court need not establish the loss with precision but rather need only make a reasonable estimate of the loss, given the available information. A court is permitted to use general points of reference as a starting point for calculating the losses or gains from fraudulent transactions and may make reasonable extrapolations from the evidence established by a preponderance of the evidence at the sentencing proceeding." *United States v. Treacy*, 639 F.3d 32, 48 (2d Cir. 2011) (internal citations omitted). In other words, as a general principle, extrapolation is an appropriate method by which to calculate a forfeiture money judgment. *United States v. Uddin*, 551 F.3d 176, 180 (2d Cir. 2009) (forfeiture order in food stamp fraud case properly entered in amount equal to loss amount that was

calculated based upon extrapolation). *Cf. United States v. Bryant*, 128 F.3d 74, 76 (2d Cir. 1997) ("it is permissible for the sentencing court, in calculating a defendant's offense level, to estimate the loss resulting from his offenses by extrapolating the average amount of loss from known data and applying that average to transactions where the exact amount of loss is unknown"); *United States v. Williams*, 553 F. App'x 73, 76-77 (2d Cir. 2014) (affirming district court's loss calculation of $4.17 million in bank fraud case even though it was "far above the loss amount documented at trial" where it was based upon extrapolating from the trial testimony the assumption that the scheme involved three days of work per week over a three year period, that the average theft was $200 per bank, and that the defendants visited five banks per day); *United States v. Akpan*, 361 F. App'x 252, 254 (2d Cir. 2010) (affirming loss calculation for sentencing purposes in excess of $200,000, in health care fraud conviction, where government proved at trial false claims reflecting $107,000 loss and court calculated loss in excess of $200,000 based upon inferences with known data).

Indeed, extrapolation appears particularly relevant to calculations in the context of fraud cases where, by the very nature of the offense, the defendant attempted to disguise the extent of the fraud. *Id.* at 253 ("Given [the health care fraud defendant's] . . . proven practice of submitting false claims . . . it was also more than reasonable for the district court to infer that the financial records evidenced a similar fraudulent practice. . . ."). That is certainly the case here, where the testimony at trial demonstrated that Defendant's record-keeping was significantly lacking and there was no documentation to corroborate the dates of service that Defendant billed. (*See* Tr. 353 (no patient files kept at

Defendant's office); 354, 357-58 (patient files kept at Defendant's home and they were "scattered in different rooms" and discovered "all over the house")).

When calculating a forfeiture order amount based upon extrapolation, the test appears to be whether the calculation is reasonable under the circumstances and supported by a preponderance of the evidence. *Uddin*, 551 F.3d at 181 ("Although there will undoubtedly be situations in which a district court's estimate of loss amount falls outside the boundaries of reasonableness, we need not define precisely what those boundaries are. It is enough that the district court here did not exceed them."). *See also Bryant*, 128 F.3d at 76 ("Although extrapolation might not be reasonable if, for example, there were few instances of fraud, or if the returns audited constituted a minuscule percentage of the total that the defendant prepared or in whose preparation he assisted, we see no unreasonableness here.").

Here, the Government has submitted an affidavit from Agent Provost containing his calculations based upon averaging the overcharges to the families at issue in each count of the indictment, and then multiplying that average by the number of families treated by Defendant. Using this methodology, Agent Provost calculates that the average overpayment per family was $5,417.82. (Dkt. 98 at ¶ 12). Agent Provost also indicates that during the time period under investigation, Defendant treated a total of 343 patients, and of those patients, there were 94 families. (*Id.*). According to Agent Provost's calculations, this resulted in a total overpayment to Defendant of $509,274.70. (*Id.*).

In many respects, Agent Provost's extrapolation methodology is not unreasonable. For instance, it provides a credit to Defendant for the value of services provided as part of

the fraudulent services, even though based upon the case law discussed above, Defendant is not entitled to any such set-off. Moreover, Agent Provost's methodology assumes that Defendant correctly billed for the treatment of individuals under CPT code 90808 (*id.*), and the evidence introduced at trial suggests that this was not the case.

However, the Court has trouble reconciling some of the calculations contained in Agent Provost's affidavit with the evidence introduced at trial. Most importantly, the total overpayment that Agent Provost calculates exceeds the total amount that was paid by BCBS to Defendant for CPT code 90808 during the relevant time period by almost $200,000. (*Id.* at ¶ 5). In other words, Agent Provosts' extrapolation method calculates that the total overpayment to Defendant for billing families using individual codes, instead of a group therapy code, was $509,274.70. (*Id.* at ¶ 12). However, according to Agent Provost, the total amount paid to Defendant during the relevant time period under CPT code 90808 was $323,600.99. (*Id.* at ¶ 5). This would suggest that Agent Provost's extrapolation method has grossly inflated the extent of Defendant's fraud.

In addition, there are other discrepancies with Agent Provost's calculations. For instance, with respect to the Ferrucci family, Agent Provost indicates that BCBS paid Defendant "$9,494.00 for counseling sessions with the Ferruccis" and that "[e]very session billed by the defendant to BCBS for the Ferruccis was a 90808 individual session." (*Id.* at ¶ 11). The evidence admitted at trial does not support Agent Provost's contentions. Specifically, Government Exhibit 10 reflects a total $8,008 billed by

Defendant to BCBS for services rendered to the Ferrucci family.[7]   Moreover, Government Exhibit 10 reflects charges by Defendant for the Ferrucci family under both CPT code 90806 and 90808.

Similarly, according to Agent Provost's affidavit, BCBS paid Defendant $5,950 for counseling sessions with the Sidotis, when they only saw Defendant for approximately 35 joint counseling sessions for which Defendant should have been paid $1,855 (i.e., a resulting overpayment of $4,095). (*Id.* at ¶ 8). However, the evidence introduced at trial reflects that Defendant was paid for 56 visits with the Sidotis at the rate of $85 billed under CPT code 90808, for a total of $4,760. (Government Exhibits 180, 181, 181C, 182, 182C, 183, 183C, 184, 185, 185C, 186, 187, 187C, 188, 189, 189C, 190, 190C, 191, 191C).[8]

Furthermore, Agent Provost indicates in his affidavit that BCBS paid Defendant $12,415 for counseling services related to the Steger family. (Dkt. 98 at ¶ 10).   The Court is not able to reconcile this figure with the evidence admitted at the trial, but the discrepancy appears to favor Defendant. Based upon a review of Government Exhibits

---

[7]   In addition to Mario Ferrucci, and his wife and daughter, Government Exhibit 10 also reflected charges billed for services allegedly rendered to a "Sando Ferrucci." The Court has not considered this information, as there was no trial testimony pertaining to the identity of "Sando Ferrucci." However, even if those charges were included, the amount still does not equal the number contained in Agent Provost's affidavit.

[8]   It is not clear whether this discrepancy in the trial evidence and Agent Provost's affidavit relates to Government Exhibits 192 through 197C that were marked as exhibits at the trial, but not introduced into evidence. Those exhibits appear to reflect additional charges related to various Sidoti family members. The Court is not able to resolve the issue based upon the record before it.

121C, 122C, 123C, 125C, 126C, 127C, 128C, 130C, 132C, 133C, 134C, 138C, 141C, 142C, 143C, 145C, 146C, 147C, covering the time period of September 23, 2007 through May 24, 2009, it appears that BCBS paid Defendant a total of $14,190 for alleged services related to the Steger family.

There could be very reasonable explanations for these discrepancies. For example, Agent Provost could be relying on information in addition to the trial exhibits in order to reach his calculations. These discrepancies do not necessarily require the wholesale disregard of Agent Provost's calculations, particularly where his extrapolation method has calculated a fraud figure that far exceeds the amount sought by the Government in a forfeiture order. *See United States v. Kasi*, 348 F. App'x 689, 692 (2d Cir. 2009) (district court's calculation of loss for purposes of sentencing in food stamp fraud case was reasonable, where other "reasonable estimates of the loss amount were as much as twice the size of the District Court's calculation. . . ."). However, given the questions raised by these discrepancies, the Court believes it would be prudent to also consider other extrapolation methods.

One other method is contained in Agent Provost's affidavit, and reflects the internal method utilized by BCBS to ascertain the overpayments to Defendant. BCBS calculated that the total overpayment was approximately $244,339.46. (Dkt. 98 at ¶ 15). Again, as with Agent Provost's calculation, the calculation by BCBS credits Defendant with the value of services provided in the fraudulent transactions, and it also does not take into account any fraud occurring with respect to charges for individual patients.

Another method would be to simply consider the charges submitted by Defendant under CPT code 90808. According to Agent Provost's affidavit, BCBS paid Defendant $323,600.99 for CPT code 90808 during the time period January 1, 2006 to April 30, 2009. (*Id.* at ¶ 5). According to the trial testimony, at least during the time period December 1, 2007 through November 2008, approximately 97.5% of Defendant's bills were charged under CPT code 90808. (Tr. 211). In other words, the evidence supports the conclusion that most of the charges submitted to BCBS by Defendant for services allegedly rendered to families were billed under CPT code 90808. (*See also* Tr. 334 (Agent Provost testified that he received material from BCBS and observed that almost all of the families being treated by Defendant were billed using CPT code 90808); Dkt. 98 at ¶ 5 (Agent Provost indicates in his affidavit that his investigation revealed that the majority of irregularities in Defendant's billing "stemmed from the defendant billing each of the individuals who saw the defendant in a family group therapy session as though they actually saw the defendant in an individual counseling session.").

Generally speaking, approximately half of Defendant's patient base consisted of families (as opposed to individuals). (*Id.* at ¶ 12 (Defendant treated 94 families and 106 individuals)). It is certainly reasonable to conclude, based upon the totality of the evidence before the Court, that most of the charges billed by Defendant to BCBS under CPT code 90808 for the treatment of families were fraudulent. This would fully support a forfeiture money judgment in the amount of $125,000 (i.e., less than half of the total fees paid to Defendant by BCBS for charges under CPT code 90808). In other words, if approximately half of Defendant's patient base was comprised of families, and most of

- 28 -

the charges for those families were submitted using CPT code 90808, then at least half of the payments to Defendant for CPT code 90808 would be fraudulent.

In the end, it is simply not possible for the Court to calculate a forfeiture money judgment with exact precision, nor is that required.  Indeed, Defendant's fraudulent conduct makes any such precise calculation impossible.  However, based upon the various methodologies discussed above, under any scenario, a forfeiture money judgment in the amount of $125,000 is well supported by the evidence before the Court. Therefore, the Court concludes, based upon the totality of proof, that the Government has established by a preponderance of the evidence that the Government is entitled to a preliminary order of forfeiture, and orders that Defendant's right, title and interest in the amount of one hundred twenty-five thousand dollars ($125,000.00) shall be forfeited to the United States as gross proceeds Defendant obtained, directly or indirectly, from the scheme to defraud a health care program.

## CONCLUSION

For the foregoing reasons, the Government has established its right to a personal money judgment against Defendant pursuant to 18 U.S.C. § 982(a)(7) in the amount of one hundred twenty-five thousand dollars ($125,000.00).

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated: January 16, 2015
          Rochester, New York

- 29 -