UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK



_____

UNITED STATES OF AMERICA,

**DECISION & ORDER**

v.

1:13-CR-19 EAW

NINA JAFARI a/k/a Fatemeh Jafari,

        Defendant.

_____

## INTRODUCTION

Defendant Nina Jafari ("Defendant"), charged in a five count indictment with health care fraud in violation of 18 U.S.C. § 1347 (Dkt. 1), was convicted after a jury trial on September 29, 2014, of counts 1, 2, 3 and 5, and acquitted of the charges in count 4 (Dkt. 82). On February 18, 2015, Defendant was sentenced to a term of incarceration of 30 months (Dkt. 111 at 2), but having received the Government's most recent restitution figures less than 10 days prior to sentencing, the Court deferred its decision concerning restitution (Dkt. 109).

In many respects, the Government's restitution requests have been a moving target, ranging from less than $30,000 to over $200,000, with the most recent request seeking restitution in the amount of $138,842.78. The evolving nature of the Government's restitution requests can be attributed, at least in part, to the intrinsic fraudulent nature of Defendant's scheme, which without question has made it exceedingly difficult to measure the extent of Defendant's fraud.

- 1 -

After careful consideration, the Court determines that an appropriate award of restitution to be paid to the victim in this case, BlueCross BlueShield of Western New York ("BCBS"), is $135,742.18 (one hundred thirty-five thousand, seven hundred forty-two dollars, and eighteen cents).

## FACTUAL BACKGROUND

Defendant, practicing as a licensed clinical social worker, was charged on January 18, 2013, with five counts of health care fraud in violation of 18 U.S.C. § 1347.[1]  The indictment alleged an overall scheme by Defendant to defraud BCBS during the time period of January 2006 through May 2009.  (Dkt. 1 at ¶ 16).  Each count in the indictment related to charges submitted by Defendant to BCBS with respect to a different family whom she claimed to have treated.[2]

In essence, the indictment alleged that Defendant billed BCBS using a Current Procedural Terminology ("CPT") code that resulted in inflated payments and payments

---

[1]    18 U.S.C. § 1347 provides, in relevant part, as follows:
    (a)    Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice –
        (1)    to defraud any health care benefit program; or
        (2)    to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,
in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both.

[2]    The patients are identified by their insurance numbers in the indictment. However, the trial exhibits and testimony, as well as the papers submitted in connection with the Government's restitution request, identify the patients by their names.  No motion to seal or otherwise keep confidential the identities of the patients has been filed. As a result, the Court will also reference the patients by their names for purposes of this Decision and Order.

for services that were never rendered. The code typically charged by Defendant was CPT code 90808, defined to be appropriate for individual psychotherapy of approximately 75 to 80 minutes face-to-face with the patient. According to the indictment, Defendant executed the fraudulent scheme in three different ways: (1) Defendant billed BCBS for individual psychotherapy sessions using CPT code 90808 when, in fact, Defendant met with the patient for less than 75 to 80 minutes; (2) Defendant met with multiple family members for group therapy sessions, but instead of billing CPT code 90847 for family psychotherapy, she charged each family member separately under CPT code 90808; and (3) Defendant billed BCBS for individual psychotherapy sessions using CPT code 90808, when no therapy sessions occurred. (*Id.* at ¶¶ 17-19).

The case was tried before a jury commencing on September 22, 2014. Among other witnesses, the Government presented testimony from five members of the families who were the subject of the counts in the indictment, representatives of BCBS, and FBI Special Agent Thomas W. Provost ("Agent Provost"). Voluminous documents were introduced into evidence reflecting charges submitted by Defendant to BCBS, including documents that contained forged signatures of Defendant's patients. (Tr.[3] 182, 270). The evidence at trial plainly demonstrated an elaborate scheme on Defendant's part to inflate her charges submitted to BCBS and to bill for services that were never rendered.

Agent Provost explained that BCBS reported Defendant to the FBI for purposes of an investigation after BCBS investigators were stymied in their efforts to review

---

[3]      References to "Tr." are to the corresponding page number(s) of the official transcript of the trial filed at Docket numbers 89 through 96.

Defendant's records and conduct an audit.  (Tr. 332; *see* Tr. 224-241, 243-246 (testimony concerning efforts by BCBS to review Defendant's records and conduct an audit)). Defendant had been identified by BCBS as an "outlier" because she stood out from the rest of her field in her billings using CPT code 90808.  (Tr. 211).  BCBS had looked at the data for December 1, 2007, through November 2008, and approximately 97.5% of Defendant's bills were charged under CPT code 90808.  (*Id.*).   Additionally, BCBS reviewed Defendant's billings for her patients during the time frame of January 1, 2006, through April 30, 2009, and of approximately 400 patients, there were only 10 patients for whom Defendant did not bill under CPT code 90808.  (Tr. at 216).

As part of the investigation, a former patient of Defendant's, Jeanette Steger, agreed to audio record conversations with Defendant.  The audio recordings, which were admitted into evidence, reflected efforts by Defendant to influence Ms. Steger's response to BCBS inquiries, including Defendant telling Ms. Steger that she should deny the existence of documents concerning her family's visits with Defendant and falsify documentation that BCBS asked Ms. Steger to complete.

The jury returned a verdict of guilty with respect to four of the five counts in the indictment.  (Dkt. 82).  The jury acquitted Defendant on count 4, charging Defendant with health care fraud from October 2006 through December 2008, by submitting fraudulent claim forms for approximately 117 individual psychotherapy sessions billed under CPT code 90808 related to the Ferrucci family.  (*Id.*).   The jury convicted Defendant of the remaining counts that charged as follows:

Count 1:    from January 2009 through May 2009, Defendant submitted fraudulent claim forms for approximately 39 individual psychotherapy sessions billed under CPT code 90808 related to the Steger family;

Count 2:    from July 2008 through February 2009, Defendant submitted fraudulent claim forms for approximately 56 individual psychotherapy sessions billed under CPT code 90808 related to the Sidoti family;

Count 3:    from December 2005 through August 2008, Defendant submitted fraudulent claim forms for approximately 114 individual psychotherapy sessions billed under CPT code 90808 related to the Willis family; and,

Count 5:    from September 2007 through July 2008, Defendant submitted fraudulent claim forms for approximately 42 individual psychotherapy sessions billed under CPT code 90808 related to the Kern family.

A number of different restitution estimates have been submitted by the Government since Defendant was convicted. In its statement with respect to sentencing factors filed on November 24, 2014, the Government requested restitution in the amount of $28,549.08. (Dkt. 93 at 3). Yet, on that same date, in its submission filed in connection with its motion for a preliminary order of forfeiture, the Government indicated that "BCBS seeks restitution in the amount of $202,750.08. . . ." (Dkt. 97 at

12).   Similarly, initial drafts of the Presentence Investigation Report ("PSR") contained varying figures based on information provided by the Government.   Then, shortly before the sentencing date in this case, the Government indicated that it was seeking restitution on behalf of BCBS in the amount of $138,842.78, and that is the figure included at paragraph 41 of the final PSR as revised February 11, 2015.

At sentencing on February 18, 2015, the Court indicated that it would order restitution in an amount to be determined, and scheduled an appearance for May 6, 2015. (Dkt. 108, 109).   The Court further directed the Government to submit by March 31, 2015, any factual affidavits setting forth in detail the manner in which the restitution amount sought by BCBS had been calculated.   (Dkt. 108).   Defendant was directed to file any response by April 21, 2015, and to notify the Court as to whether she requested an evidentiary hearing with respect to the restitution amount.   (*Id.*).

On March 23, 2015, the Government submitted an affidavit from Susan B. Schultz, Manager of the Special Investigations Unit at BCBS, in support of its requested restitution figure.   (Dkt. 114-1).   On April 27, 2015, the Court received a letter from defense counsel, indicating that a hearing on the restitution issue was not necessary, and that Defendant did not have any further submissions to make in response.   (Dkt. 116).

On May 8, 2015,[4] the parties appeared before the Court, and at the Court's request, Ms. Schultz appeared and testified in response to the Court's questions concerning the

---

[4]   The appearance was originally scheduled for May 6, 2015, but had to be rescheduled due to the fact that Defendant had not been transported from the Federal Bureau of Prisons to Buffalo, New York, by that date.

restitution figure.  (Dkt. 118).  Agent Provost was also present and provided testimony. The Court reserved decision.  (*Id.*).

## DISCUSSION

I. **The Mandatory Victim Restitution Act**

The Mandatory Victim Restitution Act, 18 U.S.C. § 3663A (the "MVRA"), makes restitution mandatory for victims of certain crimes.  Section 3663A(a)(1) states that "[n]otwithstanding any other provision of law, when sentencing a defendant convicted of an offense described in subsection (c), the court shall order . . . that the defendant make restitution to the victim of the offense or, if the victim is deceased, to the victim's estate."

The MVRA applies to all sentencing proceedings for convictions of, or plea agreements relating to charges for, any offense that is (1) a crime of violence, (2) an offense against property, including any offense committed by fraud or deceit, (3) an offense relating to tampering with consumer products, or (4) an offense relating to theft of medical products; *and* in which an identifiable victim or victims has suffered a physical injury or pecuniary loss.  18 U.S.C. § 3663A(c)(1)(A) and (B) (emphasis added). The MVRA applies to health care fraud because it is an offense committed by fraud or deceit and an offense against property.  *United States v. Fogel*, 494 F. Supp. 2d 136, 138 (D. Conn. 2007) (the MVRA applies to a health care fraud offense because it "is undisputedly 'an offense against property,' an 'offense committed by fraud or deceit,' and one 'in which an identifiable victim or victims has suffered a physical injury or pecuniary loss.'") (quoting 18 U.S.C. § 3663A(c)).

"Trial judges enjoy broad discretion in ordering restitution.  Unless the judge abuses that discretion by using improper considerations or unreliable information, an award of restitution authorized by statute will not be vacated on review." *United States v. Loscalzo*, 18 F.3d 374, 386 (7th Cir. 1994); *see also United States v. Grundhoefer*, 916 F.2d 788, 793 (2d Cir. 1990) (court has "broad authority to order restitution as part of sentencing. . . ."). Furthermore, "[r]estitution is compensatory, not punitive.  In a fraud case, it is limited to the actual loss *directly caused* by the defendant's criminal conduct in the course of the scheme alleged in the indictment." *United States v. Chaika*, 695 F.3d 741, 748 (8th Cir. 2012) (internal quotations and citation omitted). *See also In re Bankr. Estate of AGS, Inc.*, 565 F. App'x 172, 175 (4th Cir. 2014) (harm that was tangential to the substantive counts of health care fraud did not qualify as restitution); *United States v. Silkowski*, 32 F.3d 682, 688 (2d Cir. 1994) (restitution is permitted "only for an amount of loss caused by the specific conduct forming the basis for the offense of conviction."). "For MVRA purposes, the court must use actual loss as its metric." *United States v. Masek*, 588 F.3d 1283, 1287 (10th Cir. 2009).  Where actual loss is not known, the court may not substitute a defendant's ill-gotten gains for the victim's actual loss. *United States v. Zangari*, 677 F.3d 86, 92-93 (2d Cir. 2012).  "Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence," and "[t]he burden of demonstrating the amount of the loss . . . [is on] the attorney for the Government."  18 U.S.C. § 3664(e).[5]

---

[5]      "Although the district cannot consider ability to pay in determining the amount of any restitution award . . . the court is obligated to set the defendant's restitution payment

Generally, restitution is awarded to a victim as part of sentencing. The statute requires that the Government provide the probation officer with a listing of the amounts subject to restitution within 60 days prior to the date initially set for sentencing. *Id.* at § (d)(1). After reviewing the report of the probation officer, the court may require additional documentation or hear testimony. *Id.* at § (d)(4). Section (d)(5) provides:

> [i]f the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government or probation officer shall so inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing. If the victim subsequently discovers further losses, the victim shall have 60 days after discovery of those losses in which to petition the court for an amended restitution order. Such order may be granted only upon a showing of good cause for the failure to include such losses in the initial claim for restitutionary relief.

18 U.S.C. § 3664(d)(5).

Sentencing was initially set for December 5, 2014. (Dkt. 84). The original sentencing date was adjourned because the Government and Defendant were unable to reach an agreement concerning the forfeiture amount. (Dkt. 101). The Court held oral argument on the forfeiture issues on December 5, 2014. (Dkt. 101, 104). The sentencing date was reset for February 18, 2015. (Dkt. 103). On January 16, 2015, the Court issued its Decision and Order granting a preliminary order of forfeiture in the amount of $125,000. (Dkt. 105). Because the restitution figure currently sought by the Government was not disclosed at least 10 days prior to sentencing, the Court did not order restitution as part of its sentencing on February 18, 2015. Rather, as mentioned previously, further

---

schedule 'in consideration of . . . the financial resources and other assets of the defendant'. . . ." *United States v. Hagerman*, 506 F. App'x 14, 21 (2d Cir. 2012) (quoting 18 U.S.C. § 3664(f)(2)).

written submissions were received by the Court, and testimony and oral argument was received on May 8, 2015.

## II.   The District Court May Order Restitution Based on a Reasonable Estimate of the Loss

In a fraud case, "[w]here difficulties arise in establishing the exact amount of restitution, a district court may accept a reasonable estimate of the loss based on the evidence presented.   When making a reasonableness determination of the restitution amount, district courts should resolve uncertainties with a view toward achieving fairness to the victim." *United States v. Rouhani*, No. 14-10611, 598 F. App'x 626, 632 (11th Cir. 2015) (internal quotations and citations omitted); *see also United States v. Baldwin*, 774 F.3d 711, 728 (11th Cir. 2014) (because the determination of a restitution amount "is by nature an inexact science," the district court may accept a reasonable estimate of the loss based on the evidence presented, and court did not err when its calculation of restitution amount "was not based on speculation, but rather, on reasonable estimates taken from facts in the record.") (internal citations omitted), *cert. denied*, 2015 U.S. LEXIS 2603 (Apr. 20, 2015); *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) ("In calculating the restitution amount [under the MVRA], absolute precision is not required. . . . [T]he district court's obligation was to attempt to come to a reasonable determination of appropriate restitution by resolving uncertainties with a view towards achieving fairness to the victim.") (internal quotations and citations omitted); *United States v. Futrell*, 209 F.3d 1286, 1292 (11th Cir. 2000) ("The law cannot be blind to the fact that criminals rarely keep detailed records of their lawless dealings, totaling up every column and

accounting for every misbegotten dollar.  Hence, the preponderance standard must be applied in a practical, common-sense way.  So long as the basis for reasonable approximation is at hand, difficulties in achieving exact measurements will not preclude a trial court from ordering restitution."); *United States v. Teehee*, 893 F.2d 271, 274 (10th Cir. 1990) ("The determination of an appropriate restitution amount is by nature an inexact science."); *United States v. Hand*, 863 F.2d 1100, 1104 (3d Cir. 1988) ("Difficulties of measurement do not preclude the court from ordering a defendant to compensate the victim through some restitution.").

As explained by the Second Circuit Court of Appeals in *United States v. Gushlak*, 728 F.3d 184 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 1528 (2014), where the defendant argued that a court's power to order restitution is limited to actual loss:

> [W]e have never used the word "actual" in this context to mean "mathematically precise."  Nor have we ever adopted a one-size-fits-all standard of precision for application in restitution cases.  To the contrary, our case law reflects the settled understanding among courts of appeals that a "reasonable approximation" will suffice, especially in cases in which an exact dollar amount is inherently incalculable. . . .
>
> We reiterate that the MVRA requires only a reasonable approximation of losses supported by a sound methodology.  As explained by the First Circuit, "the preponderance of the evidence standard must be applied in a practical, common-sense way.  So long as the basis for reasonable approximation is at hand, difficulties in achieving exact measurements will not preclude a trial court from ordering restitution."

*Id.* at 195-96 (citations omitted); *United States v. Skowron*, 529 F. App'x 71, 74 (2d Cir. 2013) (district court did not abuse its discretion in ordering restitution equaling 20 percent of the defendant's salary for the period of his offense, and citing to *United States v. Bahel*, 662 F.3d 610 (2d Cir. 2011) for the proposition that requiring a defendant to

repay less than ten percent of his total salary was a "conservative estimate" of the cost of the fraud with respect to his salary); *United States v. Marino*, 654 F.3d 310, 315-16, 324 (2d Cir. 2011) (affirming restitution amount of $60 million, which was the estimated amount of losses suffered by investors between January and August 2005); *c.f. United States v. Schwamborn*, 467 F. App'x 35, 38 (2d Cir. 2012) ("We review an order of restitution deferentially because determining the appropriate amount of restitution requires a delicate balancing of diverse, sometimes incomparable factors. Nonetheless, the MVRA requires the district court to order restitution in the *full* amount of each victim's losses. Accordingly, we held in *United States v. Reifler* that the district court's acceptance of the government's rough estimate of the restitution amount plainly contravene[d] the MVRA's requirement that any restitution order compensate the victims in full.") (internal quotations and citations omitted); *United States v. Catoggio*, 326 F.3d 323, 328-29 (2d Cir. 2003) (district court erred because it did not order restitution in the full amount of the victim's losses, neither party nor the district court believed the $80 million figure was an accurate statement of the victim's losses, and the court made no indication that the $80 million figure was an estimate of actual loss).

## III. The Court May Consider the Entire Scheme, as Opposed to Only the Counts of Conviction

The Supreme Court of the United States considered whether an award of restitution may be based on uncharged or acquitted conduct under the statutory scheme set forth in the Victim and Witness Protection Act (the "VWPA"), in *Hughey v. United States*, 495 U.S. 411 (1990). In *Hughey*, the Court held that the VWPA only authorized

an award of restitution caused by the loss of the specific conduct underlying the offense of conviction. *Id.* at 417-18. However, following *Hughey*, amendments to the VWPA, and the MVRA, allowed for broader restitution for offenses involving "as an element a scheme, a conspiracy, or pattern of criminal activity." *Smullen v. United States*, 94 F.3d 20, 25 n.4 (1st Cir. 1996); *United States v. Edwards*, 728 F.3d 1286, 1292 (11th Cir. 2013) ("As we have previously explained, the enactment of the MVRA all but eviscerated *Hughey* with respect to crimes involving schemes.") (quoting *United States v. Dickerson*, 370 F.3d 1330, 1338 (11th Cir. 2004)).

The Second Circuit Court of Appeals has not directly addressed the question of whether a defendant should pay restitution for acquitted or uncharged conduct in the context of a scheme to commit health care fraud. However, in *United States v. Boyd*, 222 F.3d 47 (2d Cir. 2000), the Second Circuit addressed a similar question. In *Boyd*, the defendant was convicted of mail and wire fraud, but acquitted of conspiracy. *Id.* at 48. The district court ordered that she pay restitution jointly with her co-defendants. *Id.* The Second Circuit affirmed the district court's order of restitution, relying on the MVRA's definition of "victim," which "traces verbatim the amended language of the [VWPA]," and found that with the amendments to the VWPA "'Congress broadened the scope of restitution from losses attributable solely to the offense of conviction to all losses caused in the course of a defendant's criminal conduct, *whether the defendant is convicted of each of those offenses or not*.'" *Id.* at 50 (quoting *United States v. Collins*, 209 F.3d 1, 3 (1st Cir. 1999)). The court therefore found that "[i]t is . . . clear that the VWPA confers authority to order a participant in a conspiracy to pay restitution even on uncharged or

acquitted counts, and it follows that the district court's restitution order in this case – made pursuant to the MVRA's identical text – was not plain error.'" *Id.* at 55. *See also United States v. Donaghy*, 570 F. Supp. 2d 411, 425-26 (E.D.N.Y. 2008) (collecting cases, and stating that the MVRA confers on the court the authority to order a participant in a conspiracy to pay restitution even on uncharged or acquitted counts), *aff'd sub nom.*, 575 F.3d 226 (2d Cir. 2009). "Therefore, in order to determine whether or not certain conduct may be the subject of a restitution order, a court must ask whether or not it is 'engaged in furtherance of the scheme, conspiracy or pattern' that was [an] element of the offense of conviction." *Id.* at 426 (citing *United States v. Kones*, 77 F.3d 66, 70 (3d Cir. 1996)); *but see United States v. Lisa*, 152 F. App'x 85, 87 (2d Cir. 2005) ("Neither *Boyd* nor any other case, however, holds that a defendant may be required to pay restitution for losses caused by acquitted or uncharged conduct that extends beyond the 'scheme, conspiracy, or pattern of criminal activity' included '*as an element*' of the offense of conviction.").

Decisions from other circuit courts have squarely addressed this issue, concluding that a defendant convicted of a scheme to defraud may be required to pay restitution for more than just the counts of conviction. *See United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014) (where defendant was convicted of bank and wire fraud, affirming district court's restitution order which included amounts attributable to the defendant's scheme, including losses from the bank fraud count on which the defendant was acquitted); *United States v. Castro*, 554 F. App'x 664, 667 (9th Cir. 2014) (where defendant was convicted of four counts of wire fraud, finding that "the restitution award

in a wire fraud case may include losses stemming from uncharged and acquitted conduct if the district court determines, by a preponderance of the evidence, that the losses all stem from the same scheme."), *cert. denied*, 135 S. Ct. 309 (2014); *United States v. Gregoire*, 638 F.3d 962, 973 n.3 (8th Cir. 2011) (where the defendant was convicted of one count of interstate transportation of stolen property and five counts of mail fraud, district court did not abuse its discretion by including in the restitution amount sale proceeds derived from the alleged scheme to defraud prior to the period set forth in the indictment); *United States v. Wesland*, 23 F.3d 205, 207 (8th Cir. 1994) ("We recognize that our sister circuits have painted in varying hues in their attempt to interpret *Hughley*," and noting that it agreed with the approach taken by the Seventh Circuit Court of Appeals in *United States v. Turino*, 978 F.2d 315, 317 (7th Cir. 1992), which affirmed a restitution award that "embraced the entire scheme," including transactions beyond those alleged in the counts of conviction); *United States v. Chaney*, 964 F.2d 437, 452 n.48 (5th Cir. 1992) (district court was not precluded from basing its restitution award on losses resulting from conduct "protruding beyond [the defendant's] acquittals. . . .");

In *United States v. Garabet*, 68 F. App'x 849 (9th Cir. 2003), a case similar to the case at hand, the Ninth Circuit Court of Appeals affirmed, in relevant part, a restitution order against an ophthalmologist who was charged on 22 counts related to surgeries that were billed but never performed. The doctor was only convicted on counts one, two, four, and five, and challenged his restitution order based on the fact that it included all reimbursement he received from Medicare for consecutive-day surgeries during the relevant period. The district court concluded that the doctor had "created a massive

scheme to defraud Medicare by submitting bills for consecutive-day surgery when surgery was only performed on one day." *Id.* at 855.   The Ninth Circuit affirmed, stating that "[w]here a defendant is convicted on a count including a scheme to defraud as an element, 'restitution may be ordered for losses to persons harmed in the course of the defendant's scheme even beyond the counts of conviction,' including losses caused by conduct relating to counts on which the defendant is acquitted." *Id.* (quoting *United States v. Lawrence*, 189 F.3d 838, 846-47 (9th Cir. 1999)).   Accordingly, "[t]he district court properly concluded that the restitution amount should include the money received by [the defendant] for all of the consecutive-day bills.   The government provided ample evidence to support the district court's decision that [the defendant] engaged in a massive fraud by sending in bills claiming two-day surgeries for one-day surgeries." *Id.*

## IV.   Restitution Owed to BCBS

Defendant was convicted of counts 1, 2, 3, and 5 of the indictment, and acquitted on count 4.   (Dkt. 82).   The Court detailed in its Decision and Order dated January 16, 2015, that it found by a preponderance of the evidence that Defendant's conduct pertaining to count 4 was part of the overarching health care fraud scheme charged in the indictment, and thus could be considered with regard to sentencing.   (Dkt. 105). Moreover, the evidence presented at trial demonstrated by a preponderance of the evidence that Defendant engaged in health care fraud with respect to the charges submitted to BCBS for services allegedly rendered during the time frame charged in the indictment (January 2006 through May 2009).   Defendant utilized the CPT code 90808 to further her scheme, and the evidence demonstrated that almost all of Defendant's bills

were submitted using this CPT code.  In other words, Defendant's fraud extended far beyond the counts of conviction.

The current restitution amount requested is $138,842.78.  To calculate this figure, Ms. Schultz reviewed all claims submitted by Defendant between January 1, 2006, through April 30, 2009, the time frame covered by the indictment.  (Dkt. 114-1 at ¶ 2).  BCBS presumed that some form of service was rendered on each date of service billed by Defendant, despite the fact that there was significant evidence presented at trial that Defendant regularly submitted bills for services that never occurred.  (*Id.* at ¶ 3).  In other words, in calculating the $138,842.78 restitution figure, Defendant was provided with the benefit of the doubt and it was assumed that she provided services on the dates indicated by her billings when, in fact, the evidence plainly demonstrated that this was not always the case.

Ms. Schultz testified that for any individuals treated by Defendant, BCBS downgraded the reimbursement code from CPT code 90808 to CPT code 90806, which is for individual psychotherapy, approximately 45 to 50 minutes.  (*Id.* at ¶ 5).  Similarly, in instances where Defendant treated only one member of a family in a given week or period of a few days, BCBS downgraded the CPT code to 90806.  (*Id.*).  BCBS consulted its reimbursement schedule for each year it examined, and subtracted the reimbursement amount for a 90806 code from that of a 90808 code, to determine the amount it had overpaid Defendant.  (*Id.*).

For patients with family members who had psychotherapy visits billed by Defendant on the same date, BCBS gave credit to Defendant for one CPT code 90847,

family psychotherapy, and subtracted that amount from the total of all the CPT 90808 codes that Defendant charged to the family on that day, to determine the overpayment. (*Id.* at ¶ 6). BCBS also followed this procedure for the billings made for family members seen on consecutive dates, as the evidence at trial demonstrated that Defendant submitted bills for different family members using consecutive dates of service, in an attempt to hide the fact that the family members were all seen at the same time in one family therapy session. (*Id.* at ¶ 7).

BCBS also took into account the testimony of the five families included in the grand jury indictment (Ferrucci, Kern, Willis, Sidoti, and Steger), to calculate the overpayment made to Defendant relating to those families. (*Id.* at ¶ 9). For example, BCBS calculated all payments made to Defendant for services rendered to Gary and Ellen Willis as overpayments, because the evidence at trial was that it was only their son who sought treatment from Defendant. (*Id.*; *see* Tr. 304-311). Additionally, while it was typically not possible to identify those instances where Defendant billed for services that were never rendered, with the Steger family it was possible to identify some of those instances as Ms. Steger kept a calendar identifying her family's visits with Defendant for at least part of the time that they treated with Defendant. (*Id.*).

At the appearance on May 8, 2015, Defendant's counsel argued that it was unfair to reduce all individual counseling sessions for services that were billed using the CPT code 90808, because there was testimony elicited during the trial that Defendant sometimes met with patients for up to an hour (and while CPT code 90808 reflected a session of 75 to 80 minutes, CPT code 90806 reflected a session of 45 to 50 minutes). In

other words, there was a gap in the billing for a session lasting between 50 and 75 minutes.

It is true that some, though not all, of the patients who testified supported the notion that sometimes Defendant would meet with them for up to an hour, but this was by no means a regular occurrence. Moreover, for those patients who provided this testimony, the session lasting up to an hour was actually a joint session which should not have been billed using either the 90806 or 90808 code, but rather should have been billed as a family psychotherapy session using CPT code 90847. (*See, e.g.,* Tr. at 177-178 (Trial Testimony of S. Kern that each session typically ran between 45 minutes to an hour, but he did not meet with Defendant alone); Tr. 280, 282-283 (Trial Testimony of M. Ferrucci that individual sessions usually lasted 45 minutes, and when he met with his wife the session usually lasted no more than an hour)).

Moreover, while it is plausible to suggest that there may have been some limited occasions where Defendant actually met with a patient in an individual session for an hour, it is by no means clear that this would have entitled Defendant to charge using CPT code 90808 (i.e., for sessions running 75 to 80 minutes). Even if it would have been appropriate for Defendant to charge using CPT code 90808 under those circumstances, thus supporting Defendant's argument that not all claims using CPT code 90808 should be converted to 90806, the reality is that it is impossible, due to Defendant's fraud and incomplete record-keeping practices, to specify those instances where it would have been appropriate for her to bill using CPT code 90808. Additionally, Defendant is already receiving significant credit in the restitution calculation by not having any dates of

service completely eliminated (other than for the Steger family where there is documented proof that Defendant billed for services never rendered and for the Willis family members who never treated with Defendant). In other words, the evidence at trial plainly demonstrated that Defendant submitted bills for services that were never rendered, claiming that she had met with patients when, in fact, no such session had taken place. Yet, the methodology utilized to calculate the restitution figure requested by the Government assumes that Defendant actually provided services on the dates that she claimed, albeit at an inflated amount.

Accordingly, the Court concludes that the methodology relied upon by the Government is reasonable and supports an award of restitution by a preponderance of the evidence. However, the Court finds problematic the estimates relating to the Ferrucci and Sidoti families. The Court noted its concerns about the calculations related to these families in its Decision and Order issued on January 16, 2015, concerning forfeiture. (Dkt. 105 at 25-26). The additional information offered by the Government since that Decision and Order has not resolved those concerns.

With respect to the Ferrucci family, the restitution figure calculated by the Government concludes that Defendant was overpaid $6,316. However, based upon the Court's own review of the billings submitted by Defendant for this family, as reflected in Government Exhibit 10, it appears that the overpayment to Defendant was actually $4,034.40 (using the same methodology offered by the Government, of converting individual sessions billed at CPT code 90808 to CPT code 90806, and converting

individual sessions for different family members on the same or consecutive dates billed at CPT code 90808 to CPT code 90847).

Similarly, with respect to the Sidoti family, the Government's restitution figure calculates that the overpayment to Defendant was $4,095. However, based upon the Court's own review of the billings submitted by Defendant for this family, as reflected in Government Exhibit 15, it appears that the overpayment to Defendant was actually $3,276 (again, using the same methodology offered by the Government).

Based upon these revised figures for overcharges for the Sidoti and Ferrucci families,[6] the Court calculates that the appropriate restitution figure is $135,742.18.

## CONCLUSION

For the foregoing reasons, Defendant is ordered to pay restitution in the amount of $135,742.18 (one hundred thirty-five thousand, seven hundred forty-two dollars, and eighteen cents).

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated: May 14, 2015
          Rochester, New York

---

[6]     As also noted in its Decision and Order of January 16, 2015, the Court found some inaccuracies with the calculation related to the Steger family, but these discrepancies appear to favor Defendant.